UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Court File No. 15-cr-165 (JRT/LIB) (19) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Yalonzo Ramon Hull, | |
| Defendant. | |

This matter comes before the undersigned United States Magistrate Judge upon Defendant Yalonzo Ramon Hull's ("Defendant") Motion to Suppress Searches and Seizures, [Docket No. 634]. This case has been referred to the undersigned Magistrate Judge for a report and recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a motions hearing on October 20, 2015, regarding the parties' pretrial motions.[1] At the motion hearing, the Court granted the parties' requests for the opportunity to provide supplemental briefing. The Court took Defendant's Motion to Suppress Searches and Seizures, [Docket No. 634], under advisement on November 15, 2015.

For reasons discussed herein, the Court recommends that Defendant's Motion to Suppress Searches and Seizures, [Docket No. 634], be **GRANTED in part** and **DENIED in part**.

---

[1] The Court addressed the parties' pretrial discovery motions by separate order, [Docket No. 978].

## I.  BACKGROUND AND STATEMENT OF FACTS

### A. Background

On May 20, 2015, Defendant was indicted with one charge of conspiracy to distribute heroin, methamphetamine, oxycodone, hydromorphone, hydrocodone, and methadone, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846. (Indictment [Docket No. 1]).

### B. Facts[2]

1. <u>November 6, 2014, Arrest</u>

On November 5, 2014, North Dakota Bureau of Criminal Investigation Special Agent Travis Zahn ("SA Zahn"), who is assigned to the Lake Region Drug Task Force, received a call from Chief Raymond Cavanaugh of the Spirit Lake Tribal Police Department. Chief Cavanaugh told SA Zahn that he was looking for a suspect, an African American female with short hair who may have been staying at the Spirit Lake Casino with a group of eight African American males. Chief Cavanaugh told SA Zahn that he had received information that the group may have been dealing narcotics out of the casino. Based on that information, SA Zahn traveled to the Spirit Lake Casino to see if he could spot the group.

While SA Zahn was on the fourth floor of the casino, he encountered a group of four African American males who passed him in the hall. SA Zahn suspected that the four individuals were members of the group referred to by Chief Cavanaugh. SA Zahn then visited the casino's security offices. The Lake Region Drug Task Force maintains an ongoing relationship with the Spirit Lake Casino security staff, who will forward reports to the task force of individuals suspected of dealing narcotics on the casino premises. SA Zahn asked the casino surveillance staff whether there was anybody in the casino he should be aware of. The casino surveillance

---

[2] Except where expressly indicated otherwise, the Court's statement of facts is derived from the testimony of North Dakota Bureau of Criminal Investigation Special Agent Travis Zahn and Red Lake Department of Safety Criminal Investigator Victoria Connor at the October 20, 2015, motions hearing.

staff indicated that SA Zahn should be aware of the group of four African American males that he had just encountered on the fourth floor of the casino. Casino security staff also informed SA Zahn that the group was staying in two or three rooms on the fourth floor of the casino.

Casino security staff then showed SA Zahn video surveillance footage of an African American male getting into the back seat of a white SUV by a grocery store located near the entrance to the casino premises and then exiting the vehicle a minute or two later. To SA Zahn, the footage appeared to record a drug transaction. However, the angle and quality of the surveillance footage was such that SA Zahn could not clearly see or identify the items that he believed had been exchanged.

SA Zahn took no further direct investigative action that day but asked casino security to keep watch on the group they had identified and to notify him if the security staff observed any suspicious activity.

On November 6, 2014, casino security called SA Zahn to inform him that they had obtained surveillance footage of suspicious activity. SA Zahn again traveled to the casino to view the footage. Casino security informed SA Zahn that the group that had been staying in the multiple rooms on the fourth floor of the casino the night before had moved to Spirit Lake Casino Cabin #5 ("Cabin Five"), a cabin on the casino grounds with the street address 7889 Highway 57, Saint Michael, North Dakota, 58370. (See Govt.'s Ex. 1 (listing the address of Cabin Five)). The footage depicted an African American male, whom SA Zahn later identified as Defendant Calvin Beasley ("Defendant Beasley"), walk from Cabin Five to get in the back seat of the same white SUV that SA Zahn had seen in the surveillance footage the day before. SA Zahn could see and identify two individuals who were in the SUV when Defendant Beasley entered it. One of the individuals, William Cavanaugh, was known to SA Zahn to use and deal

drugs and to have a record of convictions for offenses unrelated to narcotics. On the video footage, SA Zahn was able to clearly see William Cavanaugh, who was sitting in the front passenger seat of the SUV, count out money which he then handed back to Defendant Beasley and Defendant Beasley then provide William Cavanaugh with a small plastic bag. After the transaction was finished, Defendant Beasley exited the SUV and returned to Cabin Five.

After reviewing the surveillance footage, SA Zahn drafted an application for a warrant to search Cabin Five to submit to the Honorable Donovan Foughty, District Judge of the Northeast Judicial District of the State of North Dakota. SA Zahn offered a sworn oral probable cause statement to Judge Foughty in support of the search warrant application. (See Govt. Ex. 2).

In the oral probable cause statement, SA Zahn stated that on November 5, 2014, he had been contacted by Chief Raymond Cavanaugh, who told SA Zahn that there was a group of eight African Americans staying at Spirit Lake Casino and that Chief Cavanaugh had received information from an anonymous source that the group had approximately $10,000 worth of drugs and currency. (Id.). SA Zahn stated that he had visited the casino on November 5, 2014, and located the group as staying in three adjoining rooms on the fourth floor of the casino. (Id.). SA Zahn stated that he had then visited the casino security offices, where he had been shown video surveillance footage of an African American male who had come out of one of the rooms and walked to the parking lot, where the male entered the vehicle of William "Huck" Cavanaugh, whom SA Zahn knew to use and deal drugs and to have been convicted of a number of crimes unrelated to narcotics. (Id.). SA Zahn stated that the footage showed the African American male and William Cavanaugh exchanging money. (Id.). SA Zahn also stated that, in his experience, the transaction looked like a narcotics deal. (Id.).

SA Zahn also stated that, on November 6, 2015, he had again been contacted by casino security, who had informed him that they had witnessed a second transaction involving William Cavanaugh. (Id.). SA Zahn stated that he had travelled to the casino to view the surveillance footage of the transaction. (Id.). SA Zahn stated that the video footage showed a female driving a 1997 GMC Yukon in which William Cavanaugh was a passenger. SA Zahn stated that the surveillance footage showed the same African American male SA Zahn had seen depicted in the November 5, 2014, video footage, exit Cabin Five and walk to the Yukon, where he entered the back passenger seat. (Id.). SA Zahn stated that the casino security officers had zoomed in on the transaction and, as a result, SA Zahn could see on the surveillance video that William Cavanaugh had counted and handed money back to the African American male, who then handed William Cavanaugh a plastic baggie containing an unidentified substance. (Id.). SA Zahn stated that the African American male returned to Cabin Five after the exchange. (Id.). SA Zahn stated that, in his training and experience, the November 6, 2014, video appeared to depict a drug transaction. (Id.).

SA Zahn stated that he believed that the group staying in the three adjoining rooms on the fourth floor of the casino on November 5, 2014, had moved to and was staying in Cabin Five at the time that he provided his sworn oral statement to Judge Foughty. (Id.).

After SA Zahn provided his sworn oral statement, Judge Foughty concluded that probable cause existed to search Cabin Five. (Id.). Judge Foughty then issued a warrant to search Cabin Five for controlled substances, drug paraphernalia, cell phones, records that would indicate illegal drug sales or usage, illegal prescription medication, marijuana, methamphetamine, heroin, monies obtained from drug sales, firearms, ammunition, and other dangerous weapons. (See Govt. Ex. 1).

SA Zahn and thirteen other officers executed the warrant on November 6, 2014, as well. Inside the cabin, the officers found five individuals, namely, Defendant, Defendant Yvette Kouayara, Steve Fagan, Defendant Brenda Fagan, and Miranda Horse. The five individuals were all grouped in the common area of the cabin. The officers secured the individuals, handcuffed them, and sat them either on the cabin's couch or at the cabin's kitchen table.

The officers questioned the individuals as to their reason for being at the casino. Defendant told SA Zahn that he was with the group as a family friend and was visiting the casino on vacation. While the officers were executing the search warrant, one of the officers noticed Steve Fagan staring at a vent. The officers became suspicious and looked inside the vent, where they discovered approximately 460 pills, packaged in bundles of 10 to 20 pills in tied-off corners of plastic baggies. The officers discovered an additional 40 to 50 pills in the cabin's other rooms. In SA Zahn's experience, packaging pills in those quantities and amounts was consistent with packaging for distribution. SA Zahn also discovered a blue bag belonging to Defendant that contained a payout sheet with handwritten names on the sheet.

The officers arrested all five individuals, including Defendant, on November 6, 2014, on the basis of the evidence gathered during the execution of the search warrant.

2. <u>May 16, 2015, Traffic Stop</u>

On May 16, 2015, Criminal Investigator Victoria Connor ("CI Connor") of the Red Lake Department of Safety received information from the security staff of the Red Lake Casino that a room at the casino had been receiving a significant amount of foot traffic. CI Connor traveled to the casino to check out the room. When CI Connor arrived, however, the casino's security staff told her that the group associated with the room had gotten into a Chevy Malibu and was driving

away from the casino heading north. Security staff showed CI Connor a recorded image of the Malibu in which the group had left the casino. She then left the casino to find the Malibu.

CI Connor located the Malibu and began to follow it. CI Connor did not observe the Malibu commit any traffic violations while she was following it. She confirmed that the vehicle had Minnesota license plates and that it was driving away from the casino. Based only on the information that she had received from the security staff at the casino, CI Connor then initiated a stop of the vehicle to search for narcotics and called for other officers to assist her.

CI Connor saw that there were five people in the Malibu. Defendant was one of three passengers sitting in the Malibu's back seat. After CI Connor stopped the Malibu, the owner of the Malibu arrived on the scene, where she gave CI Connor permission to search the Malibu.

While CI Connor searched the Malibu, she had the driver, Defendant, and the other three passengers exit the vehicle and wait by the side of the road. CI Connor did not discover any contraband as a result of the search of the Malibu.

While she had Defendant and the vehicle's other occupants standing on the side of the road, CI Connor asked Defendant and the two other individuals who had been in the back seat of the Malibu about their purpose for staying at the casino and being in Red Lake. They told CI Connor that they were staying at the casino to visit people. During the conversation, CI Connor learned that Defendant and one of the other passengers had been removed from the casino. She then escorted Defendant and that other passenger back to the casino to retrieve their belongings, after which she escorted them off the reservation.

## II. DEFENDANT'S MOTION TO SUPPRESS SEARCHES AND SEIZURES, [DOCKET NO. 634]

Defendant moves the Court for an order suppressing any evidence obtained as a result of Defendant's arrest without a warrant on November 6, 2014, and as a result of the May 16, 2015, stop of the Chevy Malibu in which he was a passenger.

### A. Standard of Review

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. Amend. IV. "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness[.]'" Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006).

"[W]hen police act upon probable cause to arrest, the term "seizure" is synonymous with the term "arrest" under the Fourth Amendment." United States v. Pratt, 355 F.3d 1119, 1122-23 (8th Cir. 2004). A court determining whether probable cause existed for an officer to arrest a suspect makes the determination based on "the objective facts available to the officers at the time of the arrest." Stoner v. Watlingten, 735 F.3d 799, 803 (8th Cir. 2013) (quoting Sheets v. Butera, 389 F.3d 772, 777 (8th Cir. 2004)). "Probable cause for an arrest exists if, at the moment the arrest was made, the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that an offense has been committed." United States v. Rivera, 370 F.3d 730, 733 (8th Cir. 2004).

Roadside traffic stops also constitute seizures for the purposes of the Fourth Amendment. See, e.g., Delaware v. Prouse, 440 U.S. 648, 653 (1979). To be lawful, a traffic stop must be supported by at least a reasonable, articulable suspicion that a crime is being committed. United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001) (citing Prouse, 440 U.S. at 663).

8

**B.     Analysis**

1. November 6, 2014, Arrest

Defendant first challenges the lawfulness of his arrest without a warrant following the execution of the search warrant for Cabin Five. Defendant does not challenge whether the warrant authorizing the search of Cabin Five was supported by probable cause. (Def.'s Memorandum in Support of Motion to Suppress, [Docket No. 927], 2). Nor does Defendant challenge his seizure while the officers executed the search warrant. Rather, Defendant contends that the officers executing the search warrant did not have probable cause to suspect him of criminal activity on which to arrest him as a consequence of the search.

In reviewing whether the facts known by the officers executing the search warrant supported probable cause to arrest Defendant, the Court is mindful that, "[b]ecause probable cause requires only a probability or substantial chance of criminal activity, rather than an actual showing of criminal activity, . . . the police need not have amassed enough evidence to justify a conviction prior to making a warrantless arrest." United States v. Mendoza, 421 F.3d 663, 667 (8th Cir. 2005) (internal citations omitted).

Citing to Ybarra v. Illinois, 444 U.S. 85, 91 (1979), Defendant contends that there was no particularized suspicion of criminality as to him and that he was arrested on the basis of his mere presence in Cabin Five.  In Ybarra, which concerned whether police could search a tavern guest present when the police executed a search warrant for the tavern and its bartender, the Supreme Court held that an individual's mere physical proximity "to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." Id. Rather, the seizure of an individual must be supported by probable cause particularized as to that individual. Id.  The Ybarra Court did not hold, however, that a person's physical proximity to

9

others suspected of criminal activity is *per se* irrelevant to a probable cause determination. In fact, after Ybarra, other courts have rejected that premise and held that an officer may draw reasonable inferences from an individual's physical proximity to others suspected of criminal activity. See, e.g., Maryland v. Pringle, 540 U.S. 366, 371 (2003); United States v. Hearn, 563 F.3d 95, 103 (5th Cir. 2009); United States v. Raborn, 872 F.2d 589 (5th Cir. 1989); accord United States v. Johnson, 28 F.3d 1487, 1495 (8th Cir. 1994) (affirming finding of probable cause as to all three occupants of a hotel room, where only one of the occupants was observed by police to have exited the room three times, looked in all directions, and, after the third exit, to have climbed on the roof of the hotel to retrieve a white plastic bag and bring it back into the hotel room, after which the three entered a taxi together).

In the present case, the officers who arrested Defendant knew that the Chief of the local tribal police had received information from an anonymous source about a group of African American individuals staying at the Spirit Lake Casino who were reported to possess approximately $10,000 in drugs and currency; that one of those individuals was seen on video surveillance engaging in two transactions that, in the training and experience of SA Zahn, appeared to be narcotics transactions; that the individual came from Cabin Five before the November 6 transaction, and returned to Cabin Five afterwards; that Defendant was in Cabin Five with four others when the police executed the search warrant; that a bag belonging to Defendant was also found in Cabin Five during the execution of the search warrant which contained what appeared to be a payout sheet with handwritten names on it; that one of the other individuals in Cabin Five drew attention to the hiding place of approximately 460 pills that were packaged in a manner consistent with distribution; and that an additional 40 to 50 pills were found in the cabin's other rooms.

The fact that a specific individual engaged in two different transactions that, in SA Zahn's training and experience, appeared to involve exchanges of narcotics, immediately after the latest of which the person returned to Cabin Five is sufficient to link the possible presence of narcotics or the proceeds thereof to Cabin Five. See, e.g., Mendoza, 421 F.3d at 667 (In determining whether probable cause exists, courts recognize that the police possess specialized law enforcement experience and may draw reasonable inferences of criminal activity from circumstances which the general public may find innocuous).  The fact that a different member of the group in Cabin Five was observed by the police to be staring at the hiding place of a significant number of pills that were packaged in a manner consistent with distribution is a basis on which it can reasonably be inferred that knowledge of the drug sales was not limited to only the single person who had been observed on surveillance video making what appeared to be drug transactions; one of them from out of Cabin Five. In addition, the presence of a significant number of other pills throughout the various rooms of the cabin supports a reasonable inference that all of the people staying in Cabin Five were aware of the presence of illegal drugs being sold by a member of the group, as does the anonymous but partially corroborated tip that the group was in possession of illegal narcotics. See, e.g., United States v. Gabrio, 295 F.3d 880, 883 (8th Cir. 2002) (noting that corroboration of tip by independently obtained evidence can increase the reliability of a tip). Finally, Defendant's presence in the cabin and the presence of his bag with what appeared to be a payout sheet with handwritten names on it inside is a reasonable basis to infer that Defendant was not merely visiting the people in the cabin, but was in fact staying there and aware of the drug transactions.  See, e.g., United States v. Carter, 854 F.2d 1102, 1105 (8th Cir. 1988) (noting presence of personal belongings among factors indicating that a person was staying in a hotel room so as to have a reasonable expectation of privacy in the room).

The Court concludes that the officers executing the search warrant were aware of sufficient objective facts on which a reasonably prudent individual would believe probable cause existed that Defendant was committing a crime when the officers arrested him on November 6, 2014. Accordingly, the Court recommends **DENYING** Defendant's Motion to Suppress Searches and Seizures, [Docket No. 634], to the extent that Defendant seeks to suppress evidence gathered as a result of his arrest without a warrant on November 6, 2014.

2. May 16, 2015, Traffic Stop

Defendant next moves the Court to suppress any evidence gathered as a result of the stop of the Chevy Malibu in which he was a passenger on May 16, 2015.[3]

It is well settled that a traffic stop must be supported by a reasonable articulable suspicion that criminal activity is afoot. See, e.g., Jones, 269 F.3d at 924. Courts determine whether an officer's suspicion is reasonable by "look[ing] at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing [based upon his] own experience and specialized training to make inferences from and deductions about the cumulative information available." United States v. Jones, 606 F.3d 964, 965-66 (8th Cir. 2010) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002) (alterations in Jones)). "Though officers may not rely on 'inarticulate hunches' to justify a stop, [Terry v. Ohio, 392 U.S. 1, 22 (1968)], the likelihood of criminal activity need not rise to the level required for probable cause. Jones, 606 F.3d at 966 (citing Arvizu, 534 U.S. at 274).

---

[3] Generally, a mere passenger does not have a reasonable expectation of privacy in a vehicle in which the passenger is riding as would confer standing on the passenger to challenge a search of the vehicle. United States v. Anguiano, 795 F.3d 873, 878 (8th Cir. 2015). However, "all occupants of a stopped vehicle are subject to a Fourth Amendment seizure." United States v. Green, 275 F.3d 694, 699 (8th Cir. 2001) (citing Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 450 (1990)). Traffic stops affect a vehicle "occupant's interest in freedom from random, unauthorized, investigatory seizures. Id. (citing Delaware v. Prouse, 440 U.S. 648, 653 (1979)). Accordingly, even a mere passenger may still contest his own seizure and seek to suppress evidence as the fruit an unlawful seizure. Id.

In the present case, the only specific information that CI Connor had and articulated in support of her traffic stop of the Chevy Malibu in which Defendant was a passenger, is that she was told by Red Lake Casino security that a room to which Defendant had earlier been associated was observed to be experiencing a significant amount of foot traffic. CI Connor also testified that prior to making the traffic stop she had <u>not</u> observed any moving violations by the Chevy Malibu

There is nothing inherently criminal about a hotel room merely receiving a significant number of visitors. Although the Court is mindful of caselaw that requires it to credit the experience and specialized training of law enforcement officers[4], the Court is equally mindful of Eighth Circuit case law holding that an officer's observation of legal but "out of the ordinary" activity which describes too large a category of people is not alone a sufficient basis to develop an individualized suspicion for a traffic stop. <u>See, e.g.</u>, <u>United States v. $45,000.00 in U.S. Currency</u>, 749 F.3d 709, 723 (8th Cir. 2014) (suppressing stop of driver whose vehicle bore out-of-state plates and who slowed vehicle when turning onto highway off ramp upon seeing drug checkpoint ahead); <u>Jones</u>, 606 F.3d at 967-68 (suppressing stop of individual walking in church parking lot while clutching the front area of his hooded sweatshirt); <u>see also</u> <u>Reid v. Georgia</u>, 448 U.S. 438, 441 (1980) (no reasonable suspicion if "circumstances describe a very large category of presumably innocent travelers"); <u>Johnson v. Campbell</u>, 332 F.3d 199, 208 (3rd Cir. 2003) ("There are limits, however, to how far police training and experience can go towards finding latent criminality in innocent acts.").

---

[4] The Court notes, however, that in the present case CI Connor did <u>not</u> testify that the significant amount of foot traffic to Defendant's hotel room had, in her training and experience, been a sign of criminal activity. In fact, CI Connor did not testify that she had actually seen the foot traffic to the hotel room as she indicated that she had departed the casino almost as soon as she had arrived in order to go look for the Chevy Malibu which had been reported by casino staff to have left the casino property before CI Connor's arrival.

Without more, the mere fact that the CI Connor was told by casino staff that they thought the hotel room in which Defendant had been staying had been visited by a significant amount of people is a circumstance that simply describes too large a number of presumably innocent hotel guests to form a reasonably articulable suspicion as the basis for making a traffic stop; particularly where, as in the present case, there was no other independently observable driving conduct of the Chevy Malibu to justify the stop.

Based on the foregoing, the Court recommends **GRANTING**, Defendant's Motion to Suppress Searches and Seizures, [Docket No. 634], to the extent that Defendant seeks to suppress any evidence[5] gathered as a result of the May 16, 2015, stop of the Chevy Malibu in which Defendant was a passenger.

## IV.   CONCLUSION

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Searches and Seizures, [Docket No. 634], be **GRANTED in part** and **DENIED in part,** as set forth above.

Dated: December 3, 2015.                                       s/ Leo I. Brisbois
                                                               Leo I. Brisbois
                                                               U.S. MAGISTRATE JUDGE

## N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served

---

[5] This would include CI Connor's observations of the vehicle and its occupants made at the point of and after the traffic stop, as well as, any statements made to CI Connor in response to her questioning conducted after the traffic stop.

with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.